# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 52
The Moore Charitable Foundation,
et al.,
   Appellants,
  v.
PJT Partners, Inc., et al.,
   Respondents,
et al.,
   Defendant.

Stephen Shackelford, Jr., for appellants.
Aidan Synnott, for respondents.

CANNATARO, J.:

On this appeal, we assess the sufficiency of a cause of action pleaded against an

investment bank for its negligent supervision and retention of an employee. Plaintiffs—a

charitable foundation and its affiliate—allege that defendants' negligent supervision of

- 1 -

their employee resulted in him defrauding them of $25 million under the guise of his employment, as part of a scheme to cover up mounting personal trading losses and embezzlements.

We hold that it was error to dismiss plaintiffs' negligence claim at the pleading stage. Contrary to the lower courts' conclusions, the complaint adequately alleged that defendants were on notice of the employee's propensity to commit fraud prior to his interactions with plaintiffs and their resulting losses. Nor can we agree that defendants' duty of supervision ran only to their "customers." We accordingly reverse the order of the Appellate Division and reinstate plaintiffs' claim.

I.

When reviewing a motion to dismiss for failure to state a claim, a court must give the complaint a liberal construction, accept the allegations as true, and, providing plaintiffs with the benefit of every favorable inference, examine the adequacy of the pleadings (*see Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 38 [2018]; *AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 5 NY3d 582, 591 [2005]; *Goshen v Mut. Life Ins. Co.*, 98 NY2d 314, 326 [2002]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). We therefore accept the following allegations as true for purposes of this appeal.

Defendants PJT Partners, Inc. (PJT) and Park Hill Group, LLC (Park Hill) are, respectively, an investment bank and a division thereof which provides global alternative asset advisory and fundraising services. In 2013, Park Hill hired Andrew Caspersen to

manage its "secondaries" business, which involved "facilitating the purchase, sale, or restructuring of ownership interests in certain kinds of investment vehicles, such as private equity or hedge funds" (Compl. ¶ 17). Caspersen was hired primarily to start a new business line focusing on "fund recapitalization" work, specifically by "representing private equity fund managers who were interested in offering liquidity to their investors" (*id.* ¶ 18).

In furtherance of that goal, defendants gave Caspersen significant authority. They authorized him to solicit potential clients over telephone and email, to use defendants' brand names and resources to market their services, and to engage with clients throughout the solicitation and negotiation process. Indeed, defendants encouraged Caspersen to act as the primary or sole point of contact for clients on his deals, including with respect to the transmission of invoices. Caspersen was also given access to virtual data rooms in which defendants stored confidential documents related to their deals.

Caspersen was a successful and high-performing employee who brought in a substantial amount of work for defendants. Over time, however, Caspersen began to display signs of "dangerous and destructive behaviors" (*id.* ¶ 25). For example, he would engage in "excessive high-risk securities trading" from personal accounts during work hours, and "would obsessively monitor his positions, often checking the value of his holdings every few minutes . . . using a variety of devices, including the computer and/or communication devices supplied to him by" defendants (*id.* ¶ 26). Caspersen also allegedly "began drinking to excess during the work day," meaning that he would frequently "arriv[e] at the office in the morning only after having consumed one or more Bloody

Marys," "typically consume 10 to 15 alcoholic drinks each day, mostly during business hours," and hold meetings with colleagues while inebriated (*id.* ¶ 27).

Nonetheless, in 2014, Caspersen landed a major deal for defendants involving the recapitalization of a private equity fund managed by Irving Place Capital (Irving Place). Defendants' role in the transaction was to find a new investor interested in buying out the fund's existing equity holders. Caspersen pitched the opportunity to Coller Capital, which agreed to serve as the lead buyer in the transaction at a price of $500 million. The transaction closed in August 2015, at which time Irving Place was to pay defendants a deal fee of $8.1 million. When the time came, however, Caspersen intercepted and diverted that fee to himself. He did so by sending a fake Park Hill invoice to Irving Place, directing that company to transfer the fee into an account created and controlled solely by Caspersen. Irving Place followed those instructions and paid the fee to Caspersen's account. Caspersen used the stolen $8.1 million fee to purchase securities on his personal account, which promptly lost all of their value.

One month after the closing, in September 2015, employees from defendants' "back office" asked Casperson about the missing fee. Caspersen falsely responded that the fee would not be paid until a "stub closing" was complete.[1] The complaint pleads that defendants "knew or should have known" that this explanation was false because they were

---

[1] As explained in the complaint, Caspersen meant that "while most of the interests in the Irving Place fund had already been paid for and transferred in a primary closing, a 'stub' portion of the interests had not yet been paid for and transferred but would be in connection with a second, smaller 'stub' closing" (Compl. ¶ 34).

"handling the Irving Place transaction, and knew or should have known that there was no stub closing on the deal" (*id.* ¶ 35). The complaint further pleads that Caspersen's explanation was "implausible and transparently false" because "[t]ypically, when there was a stub closing on a deal, which was rare, [defendants] would nevertheless receive [their] fee in connection with the primary closing" and only a "pro rata portion of the fee, attributable to the undisclosed 'stub' part of the deal" would be deferred in connection with the stub closing (*id.* ¶¶ 36-37). Nonetheless, defendants did not challenge Caspersen's explanation or immediately inquire further about the delayed payment.

Caspersen understood that as the end of the year approached, defendants would likely insist on receiving the $8.1 million fee; accordingly, he devised a scheme to obtain replacement funds from plaintiff The Moore Charitable Foundation (the Foundation) and use them to pay what defendants were owed. In October 2015, Caspersen contacted the Foundation "using a legitimate PJT email address" and offered it "an opportunity to invest in a security with a risk-free 15% rate of return" (Compl. ¶ 41). In subsequent communications, Caspersen told the Foundation that the opportunity related to the Irving Place transaction, which he falsely stated had not yet closed. More specifically, Caspersen "claimed that he was syndicating an $80 million loan that he had agreed to make to Coller Capital in order to help facilitate the closing of the transaction," and that he was soliciting investors in that financing (*id.*). To support the validity of the transaction, Casperson used his PJT email account to send the Foundation a real annual financial report for Irving Place, obtained from defendants' data room, which bore a Park Hill watermark. The Foundation ultimately agreed to contribute $25 million in financing.

In November 2015, Caspersen used his PJT email account to send wire instructions to the Foundation. The instructions were written on Park Hill letterhead and directed that the funds be sent to a special purpose vehicle (SPV) created and controlled by Casperson but named to appear like an Irving Place-affiliated entity. Over the next few days, Caspersen again used his PJT email address to send the Foundation a promissory note, security agreement, and letter from the SPV, all bearing the signature of "John Nelson," a fictitious authorized signatory for Irving Place.

The Foundation transferred the $25 million to the SPV account through plaintiff Kendall JMAC. The complaint pleads that plaintiffs did so based on their "reasonable reliance on the strong reputation of [defendants] as well as Caspersen's position there" (*id.* ¶ 46). Within days, Caspersen transferred $8.1 million from the SPV account to defendants, "making it appear" that Irving Place was finally paying the missing deal fee (*id.* ¶ 47). Caspersen transferred the remainder of plaintiffs' $25 million financing to his personal account, where he used the funds to engage in speculative securities trading that eventually resulted in losses of approximately $14.5 million.

Caspersen maintained his ruse for several months by making fake interest payments to the Foundation on the fake promissory note. In March 2016, however, the Foundation discovered the fraud when its representative asked to speak with John Nelson and discovered that no such person existed. Later that year, Caspersen entered a plea of guilty in federal court to securities and mail fraud charges and was sentenced to a four-year term of imprisonment. Although ordered to pay restitution to plaintiffs, Caspersen has not done so.

Plaintiffs eventually commenced this action against defendants to recover their losses, asserting causes of action against defendants for negligent supervision and retention, conversion, and fraud. Defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (7) and 3016 (b). As relevant here, Supreme Court dismissed plaintiffs' cause of action for negligent supervision and retention but allowed other claims to proceed. The court explained that it was dismissing the negligence claim based on plaintiffs' failure to adequately plead that defendants were on notice of Caspersen's propensity for fraud, and had "not considered" whether defendants' duty ran only to customers.

On the parties' cross appeals, the Appellate Division modified Supreme Court to the extent of dismissing plaintiffs' complaint in its entirety (178 AD3d 433 [1st Dept 2019]). The Court affirmed the dismissal of the negligent supervision and retention claim based on its conclusion that the complaint did "not allege that defendants were aware of the facts that plaintiff[s] contend[] would have put them on notice of the employee's criminal propensity" (*id.* at 434). "Further," the Court summarily held, "the complaint also fails to allege that plaintiffs were ever customers of defendants, which is fatal to a claim of negligent supervision" (*id.*). This Court granted plaintiffs' motion for leave to appeal (35 NY3d 914 [2020]).

II.

It is well-settled that to establish a claim of negligence, a plaintiff must prove: a duty owed to the plaintiff by the defendant, a breach of that duty, and injury proximately resulting therefrom (*Pasternack v Laboratory Corp. of Am. Holdings*, 27 NY3d 817, 825 [2016]; *Solomon v City of New York*, 66 NY2d 1026, 1027 [1985]; *Akins v Glens Falls City*

*School Dist.*, 53 NY2d 325, 333 [1981]).  Where the negligence claim relates to an employer's retention and supervision of an employee, the complaint must include allegations that: (1) the employer had actual or constructive knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm; (2) the employer knew or should have known that it had the ability to control the employee and of the necessity and opportunity for exercising such control; and (3) the employee engaged in tortious conduct on the employer's premises or using property or resources available to the employee only through their status as an employee, including intellectual property and confidential information (*see e.g.* Restatement [Second] of Torts § 317, Comment b; Restatement [Second] of Agency § 219 [stating an employer is liable for the torts of employees acting outside the scope of their employment if, *inter alia*, the employee was "aided in accomplishing the tort by the existence of the agency relation"]; *Kenneth R. v Roman Catholic Diocese of Brooklyn*, 229 AD2d 159, 161 [2d Dept 1997] [citing, *inter alia*, *Hall v Smathers* (240 NY 486 [1925]), *Park v New York Cent. & Hudson R. R. Co.* (155 NY 215 [1898]), and *Detone v Bullit Courier Serv.* (140 AD2d 278, 279 [1st Dept 1988])]).

Here, plaintiffs' complaint adequately states a claim for negligent supervision and retention.  Contrary to the holdings of the courts below, the complaint adequately alleges that defendants had notice of Caspersen's propensity to commit fraud.  Further, the Appellate Division erred in holding that a customer relationship is a prerequisite to duty in a negligent supervision claim.

A.

When an employer has notice of its employee's propensity to engage in tortious conduct, yet retains and fails to reasonably supervise such employee, the employer may become liable for injuries thereafter proximately caused by its negligent supervision and retention (*see* 52 NY Jur Employment Relations § 391; *Park*, 155 NY 215).  As every Department of the Appellate Division has recognized, a defendant is on notice of an employee's propensity to engage in tortious conduct when it knows or should know of the employee's tendency to engage in such conduct (*see e.g.*, *Belcastro v R.C. Diocese of Brooklyn, NY*, 213 AD3d 800, 800 [2d Dept 2023]; *Druger v Syracuse Univ.*, 207 AD3d 1153, 1154 [4th Dept 2022]; *Pirro v Bd. of Trustees of the Vil. of Groton*, 203 AD3d 1263, 1271 [3d Dept 2022]; *Gibbs v L,man Manhattan Preparatory Sch.*, 201 AD3d 569, 569 [1st Dept 2022]; 52 NY Jur Employment Relations § 391).

In this case, defendants argue that the only circumstance in which an employer "should know" of an employee's propensity for tortious conduct is when the employer has *actual* knowledge of multiple past acts by the employee similar to those alleged in the complaint.  Because the complaint here does not contain such allegations, defendants argue that dismissal was proper.

We disagree.  Certainly, allegations that a defendant had actual knowledge of prior acts by an employee similar to those alleged in the complaint satisfy the notice element (*see Hogle v H. H. Franklin Mfg. Co.*, 199 NY 388, 392 [1910] [knowledge of propensity established by evidence that employees threw objects out of factory windows onto plaintiff's property for more than a year "with the knowledge of the defendant"]).

However, an employer cannot avoid liability for negligent supervision and retention by shutting its eyes to the tortious practices and propensities of its employees—that is, by being doubly negligent. An employer "should know" of an employee's dangerous propensity if it has *reason* to know of the facts or events evidencing that propensity, and may be liable if it nonetheless "place[s] the employee in a position to cause foreseeable harm" (*see Detone*, 140 AD2d at 279; *see e.g.*, *Hall*, 240 NY at 490 [notice of superintendent's violent tendencies was shown by "repeated complaints" made to defendants by tenants and visitors]; *Park*, 155 NY at 219 [constructive knowledge of railroad employee's propensity for negligence "may be shown by evidence tending to establish that such incompetency was generally known in the community"]).[2] Put differently, the notice element is satisfied if a reasonably prudent employer, exercising ordinary care under the circumstances, would have been aware of the employee's propensity to engage in the injury-causing conduct. Where the various facts and circumstances alleged in a complaint permit such an inference, the notice element is adequately pleaded (*see Cortlandt St. Recovery Corp.*, 31 NY3d at 38).

---

[2] Defendants' argument that actual knowledge of prior bad acts is required to plead notice in this context is similar to an argument we rejected in *Sanchez v State* (99 NY2d 247, 253-254 [2002]), involving a claim against the State for its alleged negligent supervision of incarcerated persons. Although defendants' actual knowledge requirement would establish "a bright-line test" for the pleading of negligent supervision and retention claims, that line would "redefine[] the traditional standard of reasonableness that has long been the touchstone of the law of negligence" by "cut[ting] off consideration of other factors that have previously been found relevant to foreseeability" (*id.* at 254).

Plaintiffs allege that defendants had notice of Caspersen's propensity to commit fraud because Caspersen engaged in excessive drinking and obsessive personal stock trading during work hours, and because he gave defendants' back-office employees a "transparently false" response when they inquired as to when defendants would receive the $8.1 million deal fee from Irving Place.

The allegations of Caspersen's purported drinking and gambling problems do not, standing alone, justify an inference that defendants should have known of Caspersen's propensity to commit fraud. For prior conduct to provide notice of an employee's propensity to commit a tort, that conduct must be "similar to the [] injury-causing act" (*see Brandy B. v Eden Cent. Sch. Dist.*, 15 NY3d 297, 302 [2010] [reaching similar conclusion with respect to a claim against a school district for failing to supervise a troubled student]). As defendants correctly argue, there is a significant disconnect between excessive drinking and obsessive personal stock trading—neither of which are illegal or tortious—and the sophisticated fraud Caspersen ultimately perpetrated against plaintiffs. The former habits may be unprofessional or irresponsible in a financial advisor, and may warrant some degree of oversight or discipline,[3] but they are not acts of dishonesty or indicative of a proclivity to mislead or intentionally harm others (*see McBride v City of New York*, 160 AD3d 414, 414 [1st Dept 2018]; *Milosevic v O'Donnell*, 89 AD3d 628, 629 [1st Dept 2011]; *see also*

_____

[3] However, the type and degree of oversight that might be reasonable when an employee displays signs of alcoholism or gambling addiction likely differ from that appropriate when an employee displays fraudulent tendencies.

*Naegele v Archdiocese of New York*, 39 AD3d 270, 270 [1st Dept 2007], *lv denied* 9 NY3d 803 [2007]).

Here, however, plaintiffs also plead that defendants should have known of Caspersen's propensity to commit fraud based on the missing $8.1 million Irving Place deal fee and Caspersen's purportedly sloppy attempt to cover up his embezzlement of that fee. As discussed, the complaint pleads that one month after the Irving Place transaction closed, employees in defendants' back office noticed the fee was missing and asked Caspersen when it would be received. Caspersen allegedly responded that it would not be paid until a "stub closing" was complete. Affording plaintiffs the benefit of all favorable inferences at this stage, we must accept that the back-office employees who heard Caspersen's explanation should have recognized it as either false or questionable based on their familiarity with the Irving Place deal or the "typical" payment structure of stub closings, and that a reasonable employer would have investigated and uncovered the embezzlement prior to the fraud against plaintiffs. The complaint also alleges that Caspersen engaged in at least one other similar diversion-and-cover-up scheme, and that further discovery could reveal more of the same behavior. Under the circumstances, we cannot dismiss that possibility as entirely speculative. At this juncture, evidence of exactly what defendants knew—and when—is primarily within their sole possession and control. Thus, we find the allegations of notice sufficient to survive a motion to dismiss under our liberal pleading standards.

B.

The Appellate Division also dismissed the negligent supervision claim based on plaintiffs' failure to allege that they "were ever customers of defendants," which the Court characterized as "fatal" (178 AD3d at 434). We disagree.

"The existence and scope of a tortfeasor's duty is, of course, a legal question for the courts" (*532 Madison Ave. Gourmet Foods, Inc. v Finlandia Ctr., Inc.*, 96 NY2d 280, 288 [2001] [*532 Madison*]). However, "[a]bsent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm" (*id.* at 289). We fix the point of a duty in a particular case

> "'by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability'"

(*532 Madison*, 96 NY2d at 288, quoting *Hamilton v Beretta U.S.A. Corp.,* 96 NY2d 222, 232 [2001]; *Palka v Servicemaster Mgt. Servs. Corp.,* 83 NY2d 579, 586 [1994]). This policy-driven analysis reflects that, "[a]t its foundation, the common law of torts is a means of apportioning risks and allocating the burden of loss" (*532 Madison*, 96 NY2d at 289). The purpose of a civil action for tort is to "compensate for the damage suffered, at the expense of the wrongdoer" (Prosser and Keeton, Torts § 2, at 7 [5th ed 1985]); however, courts first must determine whether defendants owed a duty to plaintiffs. "This restriction is necessary to avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act," even if some of

those persons' injuries might be characterized as foreseeable (*532 Madison*, 96 NY2d at 289).

We have never held that a cause of action for negligent supervision and retention is maintainable only by customers of the defendant. Indeed, there is substantial authority in this State that non-customers may pursue such claims, particularly when they allege physical injuries or property damage inflicted by a negligently supervised employee (*see e.g. Hogle*, 199 NY at 392; *Selmani v City of New York*, 116 AD3d 943, 943 [2d Dept 2014]; *Quiroz v Zottola*, 96 AD3d 1035, 1036 [2d Dept 2012]; *see also* Restatement [Second] of Torts § 317). Thus, to the extent defendants argue that a special relationship or privity between plaintiff and employer is a necessary element of a negligent supervision claim, we expressly reject any such requirement (*see* NY PJI 2:240, Comment [advising that an employer "is liable for any harm to other persons resulting from its employee's" act, and that liability is "not necessarily predicated on any special relationship between the employer and plaintiff"] [citing *Haddock v New York*, 75 NY2d 478 [1990]]).[4]

---

[4] In support of their argument that a special relationship should be required when a plaintiff seeks to recover purely economic losses, defendants cite two cases in which the First and Second Departments dismissed negligent supervision and retention claims based on the absence of a "special duty" or "privity" running between the defendant employers and the plaintiffs (*see Heffernan v Marine Midland Bank*, 267 AD2d 83, 84 [1st Dept 1999]; *Gottlieb v Sullivan & Cromwell*, 203 AD2d 241, 241–242 [2d Dept 1994]). Neither case supports the rule adopted below. In *Gottlieb*, a law firm's rogue employees stole confidential information and sold it to third parties who used it to make illegal trades. The plaintiff was an unaffiliated trader on the American Stock Exchange, who alleged losses because the illegal trades affected the market and, consequently, the value of his holdings. *Gottlieb* correctly refused to extend the duty to persons injured because of an attenuated chain of events eventually allegedly affecting the stock market. Here, unlike in *Gottlieb*, plaintiffs alleged they were directly defrauded by the negligently supervised employee.

Concerns about crushing liability to an indeterminate class of plaintiffs carry less weight in a negligent supervision and retention case, because the elements of the tort already protect employers from limitless liability in several ways. First, we have already recognized that the employer-employee relationship gives rise to a duty to properly supervise and oversee the conduct of employees (*see Hamilton*, 96 NY2d at 233). Second, as discussed above, the employer must have had actual or constructive notice of the employee's propensity to engage in a particular type of tortious conduct. Third, a defendant's duty in this context is only to act as a prudent and reasonable employer would under the circumstances. Finally, as in every tort action, the injuries alleged must have been proximately caused by the defendant's negligent supervision and retention. In other words, there must be a nexus between the actions or omissions of the employer and the harm the employee was able to inflict. Ultimately, if the employee's tortious conduct is too attenuated from the employment relationship, the employer will not be liable.

In light of the above requirements, our dissenting colleagues are simply incorrect that without a customer rule, "any employee . . . who goes into the office or uses a telephone to defraud any third party may expose the employer to liability," making New York "unpalatable" to employers and threatening its status as "a leading commercial center" (dissenting op. at 4, 11). Rather, our framework ensures that an employer is liable only

---

*Heffernan*, in turn, relied exclusively on *Gottlieb* to support its summary determination that plaintiffs in that case failed to allege facts "showing a special duty running from the bank to them" (*Heffernan*, 267 AD2d at 84). Insofar as that case relied on *Gottlieb*, it does not support a rule requiring a customer relationship; insofar as it would require a "special" duty, it is an inaccurate framing of the law.

when it has notice of a particular employee's propensity for tortious conduct but neglects to reasonably supervise and control such employee, enabling the employee to harm third parties aided by the use of the employer's resources. There is no policy or commercial benefit that would justify relieving employers of liability for injuries proximately resulting from such negligence based solely upon the absence of a customer relationship between the employer and the injured party.

Here, plaintiffs were not customers of defendants, as that term is typically understood, but plaintiffs alleged that they were prospective customers who were solicited by Caspersen to participate in a financing arrangement related to one of defendants' legitimate business deals, supported by defendants' genuine documentation and information, which he was given access to by defendants as part of his employment. We hold that these allegations support the existence of a duty on the part of defendants to non-negligently supervise Caspersen for plaintiff's benefit (*see 532 Madison*, 96 NY2d at 288 [listing "the reasonable expectations of parties" as one of the critical factors to be balanced in defining the scope of a duty]).

The dissent characterizes this holding as out-of-step with the laws of other jurisdictions (*see* dissenting op. at 9-10), but most of the cases it cites do not in fact involve negligent supervision and retention claims. Two of the cases involved negligent misrepresentation claims (*see Giannacopoulos v Credit Suisse*, 37 F Supp 2d 626 [SD NY 1999]; *Clark v Davenport*, 2019 WL 3230928 [Del Chancery Court 2019]). The majority of the cases involved large-scale industrial accidents, which can pose the risk of liability on a mammoth scale from a single incident (*see S. California Gas Leak Cases*, 7 Cal 5th

391, 396 [2019]; *Balfour Beatty Infrastructure, Inc. v Rummel Klepper & Kahl, LLP*, 451 Md 600 [2017]; *Lawrence v O & G Indus., Inc.*, 319 Conn 641 [2015]; *In re Chicago Flood Litig.*, 176 Ill 2d 179 [1997]; *Petitions of Kinsman Transit Co.*, 388 F 2d 821 [2d Cir 1968]). Finally, in two of the cases, the plaintiffs argued that the defendant-employers had duties to prevent their former employees from committing torts even after terminating those employees (*see Prymark v Contemporary Fin. Solutions, Inc.*, 2007 WL 4250020 [D Colo Nov. 29, 2007, No. 07-cv-00103_EWN-KLM]; *Palmer v Shearson Lehman Hutton*, 622 So 2d 1085 [Fla Dist Ct App, 1st Dist 1993]).  None of the cases cited by the dissent limit the persons eligible to bring negligent supervision and retention claims to customers or those in privity with the employer.

Thus, plaintiffs have adequately alleged a claim for negligent supervision and retention.  The Appellate Division therefore erred in dismissing the claim.

The order of the Appellate Division insofar as appealed from should be reversed, with costs, and so much of defendants' motion as sought dismissal of plaintiffs' negligent supervision claim denied.

SINGAS, J. (dissenting):

New York is the financial capital of the country, if not the world.  This preeminent

status, which has drawn business interests to New York for centuries, is due in large part

to the predictability of our law.  Commercial and financial sectors depend on our courts for

clarity and guidance. Today's majority opinion offers neither. Worse, it exposes law firms, banks, hedge funds, and countless other financial institutions to limitless liability for the criminal actions of rogue employees. Such unprecedented exposure will all but transform employers into insurers, an outcome against which we have repeatedly cautioned. I dissent.

I.

In his capacity as manager, and then partner, at PJT, Andrew Caspersen specialized in representing private fund managers in fund recapitalization deals. In October 2015, having lost millions of dollars due to excessive personal trading, Caspersen used his PJT email address to contact his friend, James McIntyre, at Moore Capital Management. Caspersen offered a fake opportunity to invest in a security—not a recapitalization—that he promised would result in large, risk-free returns. Neither McIntyre nor Moore Capital Management was a client of either Caspersen or PJT. Instead, Caspersen knew McIntyre because they went to college together.

The Moore Charitable Foundation, an entity related to Moore Capital Management, expressed interest in Caspersen's fraudulent proposal after he sent a PJT document from a real, but closed, recapitalization deal. Caspersen also sent the Foundation instructions on PJT letterhead to wire money to a non-PJT entity he had created and used his PJT email account to send a fake promissory note and security agreement in connection with the Foundation's proposed investment. The Foundation then wired Caspersen $25 million dollars, which Caspersen largely gambled away.

II.

We must now answer the "threshold question in [this] negligence action[]: does defendant owe a legally recognized duty of care to plaintiff?" (*Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 232 [2001]). Traditionally, courts determine the scope of a duty upon a consideration of multiple factors, including, as most relevant here, "the proliferation of claims [and] the likelihood of unlimited or insurer-like liability" (*Matter of New York City Asbestos Litig.*, 5 NY3d 486, 493 [2005] [internal quotation marks omitted]). As to these factors, the majority recognizes that courts must " 'avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act,' even if some of those persons' injuries might be characterized as foreseeable" (majority op at 13-14, citing *532 Madison Ave. Gourmet Foods, Inc. v Finlandia Ctr., Inc.*, 96 NY2d 280, 289 [2001] [*532 Madison*]). But despite that significant concern, the majority proceeds to effectively imply that an employer owes a duty to all prospective customers.[1]

Permitting all potential customers to sue employers for an employee's fraud unrelated to the employment but perpetrated via company email or phone would result in unmitigated proliferation of claims and virtually unlimited liability, well beyond the

---

[1] The majority correctly notes that the underlying litigation is at the pleading stage, where we "must give the complaint a liberal construction [and] accept the allegations as true," without regard to whether plaintiffs " 'can ultimately establish [their] allegations' " (majority op at 2, quoting *EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). The very fact that the allegations thus are necessarily unestablished renders the majority's vast expansion of duty jurisprudence especially troubling.

traditional concepts of respondeat superior and apparent authority.[2]   This Court has repeatedly cautioned against subjecting a defendant "to limitless liability to an indeterminate class of persons conceivably injured" (*Hamilton*, 96 NY2d at 232).  But the majority now suggests that any time an employee makes use of "the employer's premises" or of "property or resources available to the employee only through their status as an employee," the employer may be held liable in negligent supervision (majority op at 8).  The majority opines that this standard will limit liability.  But by their logic, any employee, regardless of their title, who goes into the office or uses a telephone to defraud any third party may expose the employer to liability.  Arguably, employers now could owe a duty to virtually anyone.

The majority also posits that liability would be limited, in part, by the elements of the tort itself (majority op at 15), but none of the elements contemplates, much less imposes a reasonable limit on, the number of potential victims—and therefore prospective plaintiffs—to whom the employer owes a duty.  Moreover, though there is a propensity

---

[2] The majority references plaintiffs' allegations that "they were prospective customers who were solicited by Caspersen to participate in a financing arrangement related to one of defendants' legitimate business deals" (majority op at 16), but plaintiffs have also acknowledged that the deal proposed to them was not legitimate; therefore, it is debatable whether plaintiffs were ever even prospective customers.  Regardless, the fraud theories of respondeat superior and apparent authority already protect potential customers interacting with employees, so long as the employee's conduct is within the scope of his employment and benefits the employer (respondeat superior) or the employer presented the employee to the potential customer as having authority to act on the employer's behalf, and the potential customer reasonably relied on that presentation (apparent authority) (*see Judith M. v Sisters of Charity Hosp.*, 93 NY2d 932, 933 [1999]; *Hallock v State of New York*, 64 NY2d 224, 231 [1984]).  The lower courts dismissed these claims below, correctly recognizing that plaintiffs' allegations were insufficient to sustain them.

element to negligent supervision, that does not pertain to the existence of a legal duty; "foreseeability bears on the scope of a duty, not whether a duty exists in the first place" (*Matter of New York City Asbestos Litig.*, 5 NY3d at 494; *see also Credit Alliance Corp. v Arthur Andersen & Co.*, 65 NY2d 536, 553 [1985] [eschewing a duty rule "permitting recovery by any foreseeable plaintiff"]).

The majority further disregards our previous emphasis on the public policy necessity of limiting an employer's liability for an employee's fraud. "[A]ny extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs" (*Hamilton*, 96 NY2d at 232). Generally, a defendant is not expected to control the conduct of third parties, "even where as a practical matter defendant can exercise such control" (*D'Amico v Christie*, 71 NY2d 76, 88 [1987]). It is reasonable to envision a duty only "where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others" (*Hamilton*, 96 NY2d at 233). "Landowners, for example, have a duty to protect tenants, patrons and invitees from foreseeable harm caused by the criminal conduct of others while they are on the premises, because the special relationship puts them in the best position to protect against the risk" (*532 Madison*, 96 NY2d at 289, citing *Nallan v Helmsley-Spear, Inc.*, 50 NY2d 507, 518-519 [1980]). But that duty "does not extend to members of the general public" (*id.*, citing *Waters v New York City Hous. Auth.*, 69 NY2d 225, 229 [1987]). The policy of limiting liability is fulfilled "because the special relationship defines the class of potential plaintiffs to whom the duty is owed" (*id.*).

Certainly, a special relationship is not required in every negligent supervision case, particularly where employers are deemed responsible for non-economic injuries inflicted by their employees.  "Liability in such cases is imposed not necessarily because of any special relationship between the employer and the injured party" (*Rodriguez v United Transp. Co.*, 246 AD2d 178, 180 [1st Dept 1998], citing *Haddock v City of New York*, 75 NY2d 478 [1990]).  Instead, because the employer put the employee in a position to cause that kind of harm (i.e. physical injury), those courts recognized the employer's legal duty to "take reasonable care in making its decision concerning the hiring and retention of the employee" (*Sheila C. v Povich*, 11 AD3d 120, 129 [1st Dept 2004]; *see also e.g. Hogle v Franklin Mfg. Co.*, 199 NY 388, 392 [1910] [plaintiff injured by items thrown by employee from factory window]; Restatement [Third] of Torts § 1 ["Physical forces that cause injury ordinarily spend themselves in predictable ways; their exact courses may be hard to predict, but their lifespan and power to harm are limited"]).

But while "[e]conomic injuries may be no less important than injuries of other kinds[,] courts impose tort liability for economic loss more selectively than liability for other types of harms," as "[e]conomic losses proliferate more easily than losses of other kinds" (Restatement [Third] of Torts § 1; *see 532 Madison*, 96 NY2d at 291-292 [where the potential claims of "those who have suffered purely economic losses" are indeterminate, "limiting the scope of defendants' duty to those who have . . . suffered personal injury or property damage—as historically courts have done—affords a principled basis for reasonably apportioning liability"]).  Therefore, this Court has consistently stated

that certain negligence actions require a relationship "so close as to approach that of privity" (*Ultramares Corp. v Touche*, 255 NY 170 [1930]).

In *Credit Alliance Corp.*, where the plaintiffs alleged fraudulent and negligent preparation of a financial report, the Court considered the "limits" of the defendant accountants' liability toward non-privy parties (65 NY2d at 541). We held that, "[a]lthough accountants might be held liable *in fraud* to non-privy parties who were intended to rely upon the accountants' misrepresentations," it is a "different question . . . whether they *owed a duty*" to these parties (*id.* at 547 [emphasis added]). Because the negligence claim "fail[ed] to set forth either a relationship of contractual privity with [defendants] or a relationship sufficiently intimate to be equated with privity, [it] should be dismissed" (*id.* at 543, 547; *see also 532 Madison*, 96 NY2d at 289 [a duty to protect a plaintiff from risk of economic harm inflicted by a third party "may arise from a special relationship" requiring that the defendant provide such protection]). The majority scarcely acknowledges this settled liability principle regarding claims of purely economic loss. Indeed, in relying on the Restatement (Second) of Torts § 317—which, by its plain language, applies to claims of "bodily harm"—to support its creation of a duty under the circumstances here, the majority effectively removes any distinction between economic and physical injury and affirmatively jettisons our precedent regarding the principles underlying that distinction altogether.

The majority further disputes the relevance of two Appellate Division decisions unequivocally requiring a special relationship in similar cases (*see* majority op at 14-15 n 4, citing *Heffernan v Marine Midland Bank*, 267 AD2d 83, 84 [1st Dept 1999] and *Gottlieb*

*v Sullivan & Cromwell*, 203 AD2d 241, 241-242 [2d Dept 1994]). In *Heffernan*, a rogue employee of the defendant bank perpetrated a Ponzi scheme, convincing friends and family to turn over funds for a nonexistent investment that the employee represented was guaranteed by the bank. The employee then deposited the funds into his personal account at the bank. The First Department affirmed the trial court's dismissal of the negligence claims against the bank, holding that "plaintiffs fail[ed] to allege any facts showing a special duty running from the bank to them" (267 AD2d at 84). The First Department cited *Gottlieb*, in which employees at Sullivan & Cromwell shared confidential firm information with third parties, who then engaged in insider trading. The Second Department affirmed the lower court's grant of summary judgment to the defendant. Rather than relying on "an attenuated chain of events eventually allegedly affecting the stock market" (majority op at 14-15 n 4), the Court observed that plaintiff, a trader who lost money on the securities in question, "was not a client of the defendant's, with the result that, in the absence of any privity between the parties, the defendant owed the plaintiff no duty in the hiring and/or supervision of its employees" (203 AD2d at 241-242). Accordingly, both cases are directly on point. And yet, because the employees in each case used the employers' property or resources, it is difficult to conceive, under the majority's standard, how the employers would not be liable to the plaintiffs.

Additional public policy urges caution here. Unrestricted and unpredictable liability could have disastrous consequences for "New York's status as the preeminent commercial center in the United States, if not the world" (*159 MP Corp. v Redbridge Bedford, LLC*, 33 NY3d 353, 359-360 [2019]). That New York is "a convenient forum which dispassionately

administers a known, stable, and commercially sophisticated body of law may be considered as much an attraction to conducting business [here] as its unique financial and communications resources" (*Eherlich-Bober & Co. v University of Houston*, 49 NY2d 574, 581-583 [1980]). If subjected to open-ended tort liability on the part of plaintiffs indiscernible in both amount and identity, financial institutions undoubtedly would consider conducting their business in foreign jurisdictions with predictable and consistent precedent. The limitless standard espoused by the majority "might engender uncertainties in the free market system in connection with untold numbers of sophisticated business transactions—a not insignificant potentiality in the State that harbors the financial capital of the world" (*Bluebird Partners v First Fid. Bank*, 94 NY2d 726, 739 [2000]).

Indeed, as did New York courts before today, other forums require a customer relationship to give rise to an employer's liability for fraud perpetrated by a rogue employee. In *Prymark v Contemporary Fin. Solutions, Inc.*, the employee of a broker-dealer registered with SEC sold unregistered securities as part of Ponzi scheme. The United States District Court of Colorado concluded that the broker-dealer "owed no duty to protect those [p]laintiffs who were not clients of [the employee] while he was in [the broker-dealer's] employ" (2007 WL 4250020, at *14 [D Colo Nov. 29, 2007, No. 07-cv-00103_EWN-KLM]). Notably, the Court did find a duty to a separate class of plaintiffs who had a client relationship (*id.* at *13). But the District Court deemed it "untenable that every employer has a special relationship, giving rise to tort liability based on harm done by third parties, with every potential customer or client" (*id.* at *12 [emphasis omitted]; *see also e.g. Giannacopoulos v Credit Suisse*, 37 F Supp 2d 626 [SD NY 1999] [dismissing

negligent supervision claims brought by plaintiff who was induced by defendant's employee to invest in failed oil venture; "not all strangers generally qualified to respond to a negligent misrepresentation can sue based on their reliance on the misrepresentation"]; *Clark v Davenport*, 2019 WL 3230928 [Del Chancery Court 2019] ["allegations describ(ing) 'mere personal friendship' . . . would not support a claim for negligent misrepresentation"]; *Palmer v Shearson Lehman Hutton*, 622 So 2d 1085 [Fla Dist Ct App, 1st Dist 1993] [no common law duty via special relationship between defendant employer and plaintiffs because plaintiffs were never customers of defendants and did not deal with defendant at the time fraudulent employee worked for defendant]).

Still other courts have acknowledged the need for something approaching privity to find liability for purely economic harm (*see e.g. Petitions of Kinsman Transit Co.*, 388 F 2d 821, 824 n 6 [2d Cir 1968] ["compensation may be precluded where—as here—the relationship between the negligence and the injury becomes too tenuous"]; *see also S. California Gas Leak Case*s, 7 Cal 5th 391, 400 [2019] ["The primary exception to the general rule of no-recovery for negligently inflicted purely economic losses is where the plaintiff and the defendant have a 'special relationship' "]; *Balfour Beatty Infrastructure, Inc. v Rummel Klepper & Kahl, LLP*, 451 Md 600, 612 [2017] [no "tort liability (for) negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury"]; *Lawrence v O & G Indus., Inc.*, 319 Conn 641, 657 [2015] [reiterating "the long established common law rule in this state" "that in the absence of privity of contract between the plaintiff and the defendant, or of an injury to the plaintiff's person or property, a plaintiff may not recover in negligence for a purely economic loss"];

*In re Chicago Flood Litig.*, 176 Ill 2d 179, 198 [1997] ["The economic loss rule avoids the consequences of open-ended tort liability"]).

Our precedent until today, consistent with these foreign cases, makes clear that defendants here owed no duty to plaintiffs for Caspersen's fraud. Plaintiffs had no connection to defendants and were targeted by a criminal actor who convinced them to invest in his scheme—involving a transaction that was not part of his job description—on the basis of his personal friendship with their employee. That Caspersen was able to perpetrate his fraud via company email did not bring it within the scope of his employment, which is why the lower courts correctly dismissed plaintiffs' respondeat superior claim. In finding an unbounded duty solely because Caspersen was employed by defendants, the majority so broadens the tort of negligent supervision as to essentially swallow claims of respondeat superior and apparent authority. More importantly here, exposing employers to virtually unrestricted liability for fraud committed by rogue employees will unsettle our financial and other commercial institutions, to the point that doing business in a State in which they face undefined, exponential liability might soon prove unpalatable.

"New York has long been a leading commercial center, and our statutes and jurisprudence have, over many years, greatly enhanced New York's leadership as the center of commercial litigation" (*Justinian Capital SPC v WestLB AG N.Y. Branch*, 28 NY3d 160, 169 [2016]). Today, we head in a different direction.

I dissent.

Order insofar as appealed from reversed, with costs, and so much of defendants' motion as sought dismissal of plaintiffs' negligent supervision claim denied. Opinion by Judge Cannataro. Chief Judge Wilson and Judges Rivera, Troutman and Smith concur. Judge Singas dissents and votes to affirm in an opinion, in which Judge Garcia concurs. Judge Halligan took no part.

Decided June 13, 2023